# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AIMEE DAVIS | : | |
|     Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 17-1381 |
| | : | |
| CITY OF PHILADELPHIA, et al. | : | |
|     Defendants. | : | |

McHUGH, J.                                                                                                                                                            January 5, 2018

## **MEMORANDUM**

Like all people who have not been found guilty of a crime, pre-trial detainees have a constitutional right to be free from punishment. This case concerns one facet of that right: detainees' right to adequate medical care, as guaranteed by the Fourteenth Amendment's substantive due process clause. Following an auto accident in which Plaintiff Aimee Davis broke her wrist, Philadelphia police arrested her and transported her to the hospital. Plaintiff was discharged with instructions from Emergency Room personnel that she needed urgent attention from an orthopedic specialist. Plaintiff remained in custody for six weeks before she received the recommended care, and by the time surgery was ultimately performed, a malunion of the bones allegedly prevented a successful outcome. She contends that she is permanently disfigured as a result, and brings claims under 42 U.S.C. § 1983 against the City of Philadelphia, Riverside Correctional Facility's medical provider and medical staff, and several police officers. She also brings medical malpractice claims against Riverside's individual medical staffers.

Motions to Dismiss by Defendants City of Philadelphia and Dr. Jonathan Cohen are pending. Because Plaintiff has pled facts sufficient to support an inference that the inadequate medical care she received amounted to punishment under the Fourteenth Amendment, and because

1

such deprivation could potentially be attributed to the City under *Monell*, I deny the City's Motion, except as to claims based on vicarious liability. *See Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691–95 (1978). I likewise deny Dr. Cohen's Motion because Plaintiff has stated claims against him for direct § 1983 liability and medical malpractice.[1]

## I. Factual Allegations

Plaintiff's relevant factual allegations, separated from her legal conclusions and taken as true, are as follows. Plaintiff broke her wrist (a left distal radius fracture) in a car accident on October 16, 2015. In connection with the accident, Philadelphia police arrested Plaintiff and took her to the hospital for emergency treatment. Hospital staff determined that her wrist bones were displaced and needed to be realigned, but their two attempts to align the bones were unsuccessful. The hospital informed Plaintiff and the arresting officers (in whose custody she remained) that the fracture was "unstable"[2] and in need of surgical repair, and that she needed to see an orthopedic specialist within two days. FAC ¶¶ 25–27. The next day, October 17th, the hospital released Plaintiff and gave her discharge documentation to the police officers.

From the hospital, police transported Plaintiff to Riverside Correctional Facility, where medical staff, including Dr. Jonathan Cohen, conducted a medical intake screening as part of her

---

[1] Plaintiff Aimee Davis originally filed this case against Defendant City of Philadelphia ["the City"] and several other entities in the Middle District of Pennsylvania. From there, Judge Brann severed the case and transferred Plaintiff's claim against the City to this district. *See generally* ECF No. 1 (the original record from the Middle District, including Plaintiff's original Complaint (ECF No. 1-1), the City's Motion to Sever (ECF No. 1-15), and Judge Brann's Memorandum (ECF No. 1-18)). Shortly after the transfer, I dismissed Plaintiff's Complaint against the City as "patently inadequate" without prejudice to refile. Order, ECF No. 4. She did so, adding several individual defendants (including movant Dr. Cohen), new professional negligence claims, and pages of factual allegations. *See* First Am. Compl., ECF No. 5 [hereinafter "FAC"].

[2] Plaintiff did not specify whether she left the hospital with anything to stabilize or protect her wrist, such as a splint or sling.

initial processing.³ Plaintiff alleges that the police officers did not relay her urgent need for specialist care to Riverside staff or take any other action to ensure she received the specialist treatment they knew she needed for her injured wrist. FAC ¶¶ 32–34. Riverside's health intake process required Plaintiff to complete an Intake Screening Questionnaire [hereinafter the "Intake Form"] that asked whether she had any "life threatening medical problems" but did not ask if she had a serious (but not life-threatening) medical need or if she had been prescribed any medical treatment, or request a description of her current conditions. FAC ¶ 36.

From the time of her arrival at Riverside on October 17th to her transfer to another correctional facility (SCI Muncy) on October 22nd, Plaintiff complained to Dr. Cohen and other Riverside medical staff of her "significant and unbearable pain and swelling" and repeatedly asked to see a specialist for her fracture, as the hospital had instructed. FAC ¶¶ 67–68. Plaintiff received over-the-counter pain medication ("Motrin, only"), but was not allowed to see a specialist. FAC ¶ 68. On October 21st—Plaintiff's fifth day at Riverside and one day before her transfer to SCI Muncy—Dr. Cohen noted in a progress report that Plaintiff had been told to consult an orthopedic surgeon and, in the "treatment" section of the report, he wrote "refer to temple orthopedics." The next day, sometime after the decision to transfer Plaintiff to SCI Muncy but before her actual transfer, Dr. Cohen "ordered an x-ray" of her wrist. FAC ¶¶ 44–45. But neither the x-ray nor the Temple Orthopedics referral happened, and Plaintiff was transferred to SCI Muncy later that day.

Dr. Cohen completed a summary "in connection with" Plaintiff's transfer to SCI Muncy [hereinafter the "Transfer Summary"]. FAC ¶ 47. Like the Intake Form, the Transfer Summary

---

³ Dr. Cohen worked for Riverside's "ABC Corp.," a fictional name Plaintiff used to describe the "governmental entity and/or private contractor retained by the City" that "provides healthcare to inmates in the Philadelphia Prison System." FAC ¶ 13. Defendants have since disclosed to Plaintiff and the Court that the health provider is Corizon Health (formerly known as Prison Health Services). Plaintiff's counsel assured the Court that she would promptly substitute the parties and seek leave to amend Plaintiff's Complaint to reflect the health provider's identity.

3

did not include questions about whether Plaintiff had serious medical needs or had been prescribed medical treatment that she had not yet received. *Id.* The Transfer Summary asked whether Plaintiff had any recent hospitalizations and if there were any consults pending, but in response to both questions, Dr. Cohen (or another Riverside medical staffer) incorrectly answered "no." FAC ¶¶ 49–50. Riverside medical staff wrote "lower bunk & tier left arm fx" in the comments section, presumably identifying Plaintiff's fracture and that she should be assigned a bottom bunk at her destination facility. FAC ¶ 51. Nowhere did Dr. Cohen indicate that Plaintiff's fracture was unstable, awaiting surgery, or that Plaintiff was "already days overdue" to be seen by a specialist and have surgery. *Id.* Dr. Cohen and the medical staffers did not send Plaintiff's medical records—either from Riverside or the hospital—on to SCI Muncy.[4]

After Plaintiff's transfer to SCI Muncy with nothing in her transfer records to indicate her urgent need for specialist care, she continued to complain of severe pain and swelling and to request the surgery she needed. It was not until November 24th that Plaintiff was finally allowed to see a surgeon—nearly six weeks after her discharge from the hospital. The specialist recommended surgery, which Plaintiff underwent six days later. By then, her wrist had begun to heal in an in improper position, which "complicat[ed] the surgery and worsen[ed] her recovery." FAC ¶ 73. Plaintiff then underwent a second surgery and received continuing orthopedic supervision and physical therapy. Plaintiff is now left with "serious and permanent damage to her

---

[4] Plaintiff does not specify when and how Riverside medical staff gained control of her hospital records. *See* FAC ¶ 60. In fact, her allegation that Riverside's medical staff "failed to send copies of the medical records in their possession to the receiving institution, including . . . the [hospital] records," FAC ¶ 60, seems at odds with her allegation that the police officers who transported her from the hospital to Riverside "failed to provide [Riverside] staff . . . with the necessary paperwork from [the hospital] [to] explain the severity of Plaintiff's conditions and needs," FAC ¶ 33. But in accordance with my duty to "construe [the] allegations in the light most favorable to the plaintiff," I consider these allegations alternative theories on the fate of Plaintiff's hospital records. *See Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 584 (2007) (explaining that the Federal Rules of Civil Procedure require a "favorable reading" of the plaintiff's complaint). I thus read Plaintiff's Complaint to allege that *either* the police failed to deliver her hospital records to Riverside or, if they did, Riverside failed to forward those hospital records to SCI Muncy upon Plaintiff's transfer.

4

left wrist," including pain, swelling, and loss of strength and motion as a result of being denied treatment while at Riverside.

## II. Plaintiff's Claims and Defendants' Motions to Dismiss

Based on these factual allegations, Plaintiff now brings 42 U.S.C. § 1983 claims against the City of Philadelphia under *Monell*, direct § 1983 claims against Dr. Cohen and all other individual defendants, and state law medical malpractice claims against Dr. Cohen and the other medical professional defendants.

Although Plaintiff's new Complaint includes detailed factual allegations sufficient to put Defendants on notice as to her claims, the organization of her Counts is confounding. Plaintiff's Count I is titled "Deliberate Indifference to Plaintiffs' [sic] Fourteenth Amendment Rights" and purports to apply to all defendants. Count II is titled "Monell Claim" and names the City and Riverside's medical provider. However, Plaintiff attributes conduct to the City in the form of a *Monell* claim (through "policy, practice, or custom" allegations) throughout Counts I and II. I therefore construe all of Plaintiff's "policy, practice, or custom" allegations against the City as the collective basis for her *Monell* claim, regardless of their location in her Complaint (whether under Count I or II). To the extent that Plaintiff's Count I attempts (again) to hold the City vicariously liable for the actions of the individual police officers or Riverside's medical staff, it is dismissed as to the City with prejudice.[5]

Beyond that, Plaintiff's Complaint alleges that the City violated her Fourteenth Amendment rights in the following ways:

---

[5] In my May 17, 2017 Order (ECF No. 4) dismissing Plaintiff's original Complaint (ECF No. 1-1) without prejudice, I explained that "Plaintiff's Complaint [was] patently inadequate to set forth a viable claim for liability under 42 U.S.C. § 1983. It name[d] only the City of Philadelphia, and no individual actors who were involved in making decisions concerning Plaintiff's medical care, despite the fact that there is no vicarious liability under §1983." Count I of Plaintiff's new Complaint continues to assert claims against the City that are not *Monell* claims, which I deem to be impermissible vicarious liability claims. *See Monell,* 436 U.S. at 692.

5

- The City has a "practice, policy, or custom" under which police officers who transport people with serious medical problems to detention facilities are not required or trained to relay pertinent medical information to medical staff at the receiving facility. FAC ¶¶ 31, 110.

- The City has a "policy, practice, and custom" of allowing its prison medical provider to use a medical Intake Screening Questionnaire that is "insufficient on its face" in that it fails to ask if the person has a serious (non-life-threatening) medical need, whether she has been prescribed any medical treatment she has not yet received, and for a description of her medical conditions. FAC ¶¶ 35–36, 104.

- The City has likewise "deliberately chosen" to use a Transfer Summary in its prisons that fails to ask "whether the prisoner has a serious medical need" or "whether the prison has been prescribed medical treatment that she has not yet received."[6] FAC ¶ 48. This choice, Plaintiff argues, "minimizes [reporting of] serious medical conditions to receiving institutions at the time of transfers by omitting relevant information," FAC ¶ 105, and amounts to a "practice, policy, or custom" of providing "such little medical information" about an inmate who is being transferred that the receiving facility must "rely solely on its own intake assessment." FAC ¶¶ 58, 61.[7]

The City made each of these decisions, Plaintiff alleges, "to avoid the burden and necessary expenses" of providing health care to detainees with serious medical problems. That is, Plaintiff claims the City has decided not to ask about or document detainees' reports of serious, non-life-threatening medical problems in order to avoid the inevitable expense of treatment "if those questions are answered affirmatively"—as they would have been here. FAC ¶¶ 48, 62.

As to Dr. Cohen, Plaintiff alleges that he violated her Fourteenth Amendment rights[8] when he:

---

[6] I note that the latter—Plaintiff's assertion that the Transfer Summary failed to ask about treatment that had been prescribed but not yet received—must be narrowed by Plaintiff's factual allegation that the Transfer Summary included a question as to "whether there were any consults pending." *See* FAC ¶ 50. Presumably, the Transfer Summary's question about pending consults would capture some, but not all, of the "prescribed medical treatment . . . not yet received." *See* FAC ¶¶ 47–48.

[7] I assume that Plaintiff's paragraph 112, which alleges a failure to train police officers on the proper use of force and deadly force, was included in error as there are no allegations supporting it. *See* FAC ¶ 112.

[8] Plaintiff claims that each of these actions demonstrated deliberate indifference—the relevant standard for claims brought by prisoners alleging inadequate medical care under the Eighth Amendment. The conceptual relationship between protections under the Eighth and Fourteenth Amendments is discussed below.

- Failed to have her seen by a specialist while she was at Riverside, FAC ¶ 53;

- Failed to order an x-ray until after she was set to be transferred to SCI Muncy, FAC ¶ 54;

- Ignored her "continuous complaints" of pain, swelling, and need for specialist treatment and surgery, FAC ¶¶ 87–88, 91, and, to the extent that Dr. Cohen took any action to address her serious medical needs, he delayed in so doing," FAC ¶ 91, thereby causing her needless suffering and "a significantly worse recovery," FAC ¶¶ 89–90;

- Provided false, misleading, or incomplete medical information to SCI Muncy, FAC ¶ 53, including by failing to notify SCI Muncy that Plaintiff had recently been hospitalized, FAC ¶ 55, or that "a consult with an orthopedic surgeon was pending," FAC ¶ 56.

Plaintiff alleges that Dr. Cohen, like the City, did so in order to avoid the costs and burdens of sending Plaintiff from Riverside to a specialist and getting her surgical treatment while she was at Riverside. FAC ¶ 70.

Defendants City of Philadelphia and Dr. Cohen now move separately under Rule 12(b)(6) to dismiss Plaintiff's claims against them. The City, moving only on its own behalf (not for its individual employees) argues that Plaintiff's *Monell* claim must fail because Plaintiff pleads "no facts" supporting municipal liability under § 1983, including how or when the policies or customs were implemented or which municipal policymaker(s) were responsible for them. Def. City's Mot. Dismiss 6–8, ECF No. 18 [hereinafter "City's MTD"]. The City also argues that Plaintiff's failure-to-train theory must fail because she does not describe "a single instance of prior misconduct" by police or correctional officers and does not "specifically plead how the [City's] training programs . . . are inadequate." City's MTD 9.

In Dr. Cohen's Motion, he mistakenly treats Plaintiff's Fourteenth Amendment constitutional claim against him as an Eighth Amendment claim, and argues that she has pled no facts showing that he was deliberately indifferent to her medical needs. Def. Cohen's Mot. Dismiss 3, ECF No. 7 [hereinafter "Cohen's MTD"]. He asserts that he "exercised his professional judgment" and "treated Plaintiff by ordering an x-ray and referring her for an

7

orthopedic evaluation." *Id.* at 4. Without directly addressing Plaintiff's claim that he unduly delayed her treatment, Dr. Cohen notes that "there is no allegation that [he] had the ability to do any more than make the referral and order the x-ray" when Plaintiff was at Riverside. *See id.*at 4 n.2. In his opposition to Plaintiff's medical malpractice claim against him, Dr. Cohen argues that Plaintiff has not alleged that he breached the standard of care. *Id.* at 7. He claims that Plaintiff's allegations—that he failed to treat her or order surgery "in a timely manner" and failed to properly respond to her complaints of pain and for appropriate care—are "directly contradicted" by Plaintiff's allegations that Dr. Cohen "told her to see an orthopedic surgeon[9] and referred her to Temple Orthopedics." *Id.* at 7 (referencing FAC ¶ 44).

### III. Standard of Review

These motions are governed by the well-established standards governing the application of Rule 12(b)(6), as amplified by *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

### IV. Analysis

To state a § 1983 claim, Davis must allege facts showing that Defendants "acted under the color of state law and denied [her] a federally protected constitutional or statutory right." *See Angelico v. Lehigh Valley Hosp.*, 184 F.3d 268, 277 (3d Cir. 1999). For purposes of the pending motions, neither Defendant disputes that Plaintiff adequately alleged they were acting under color

---

[9] On this point, it is clear to me that Dr. Cohen misreads Plaintiff's complaint. Plaintiff writes: "[Dr.] Cohen's progress reports reflect that Plaintiff reported that she was told to go to an orthopedic surgeon, and under 'treatment' Defendant Cohen wrote 'refer to temple orthopedics.'" Reading this plain language in the context of Plaintiff's full complaint, it is clear me that Plaintiff is alleging that she told Dr. Cohen that she had been told *by hospital staff* that she must see an orthopedic surgeon. Dr. Cohen apparently reads this same sentence to mean that he *himself* told Plaintiff she needed to see an orthopedic surgeon—and that she then reported that (back) to him, and he then noted her "report" in his progress notes. I find Dr. Cohen's reading nonsensical in that it ignores the phrase's plain meaning and its context in the Complaint (which is replete with allegations that Plaintiff told Riverside staff that the hospital instructed her to see a specialist immediately). Perhaps most importantly, it ignores the reality of prison, where a doctor's recommendation to a detainee that she see a specialist has no effect, since detainees are unable to coordinate their own care and are, as a matter of law, completely reliant on their prison doctors to arrange for it. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.").

of state law. I therefore analyze only whether Plaintiff identified a constitutional right, and plausibly alleged that Defendants denied her that right.

   A. <u>The Constitutional Right and its Level of Protection</u>

The first step in evaluating a § 1983 claim is to "identify the exact contours of the underlying right" in order to determine whether the plaintiff has alleged a deprivation of any constitutional right. *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)). Plaintiff's Complaint certainly identifies a constitutional right: her Fourteenth Amendment substantive due process right to be free from punishment, as someone not adjudicated guilty. Despite the parties' early confusion on this point, they are now in agreement.[10] I will nevertheless discuss the nature of the right at issue in order to resolve whatever ambiguity may remain in the Defendants' briefs, and to define the legal standard controlling this case.

When Plaintiff was at Riverside, she was a pre-trial detainee—a person confined to a correctional facility "prior to a determination of [her] guilt or innocence." *See Bell v. Wolfish*, 441 U.S. 520, 523 (1979). Under the substantive due process clause of the Fourteenth Amendment, subjecting pre-trial detainees "to any form of punishment at all is an unconstitutional deprivation of their liberty." *Id.* at 579–80. The Third Circuit has recognized that inadequate conditions of confinement, including deprivation of necessary medical care, are one form of punishment

---

[10] Plaintiff's original Complaint identified an Eighth Amendment right to be free from cruel and unusual punishment. ECF No. 1-1. After I dismissed that Complaint without prejudice for various inadequacies, she filed an Amended Complaint identifying her substantive due process rights under the Fourteenth Amendment. *See* FAC ¶¶ 20 (beginning Plaintiff's Count I), 109. The City's pending motion does not characterize the right at all, but Dr. Cohen's Motion and the parties' joint Rule 26(f) report, ECF No. 20, repeatedly refer to prisoners' Eighth Amendment right to be free from cruel and unusual punishment. All counsel agreed at the preliminary pretrial conference that, because Plaintiff was a pre-trial detainee at all relevant times, the right at issue here derives from the Fourteenth, rather than the Eighth, Amendment.

9

impermissible under the Fourteenth Amendment. *Natale*, 318 F.3d at 583 (recognizing a pre-trial detainee's right to adequate medical care under the Fourteenth Amendment).[11]

Nearly four decades ago, the Supreme Court held in *Wolfish* that "[i]n evaluating the conditions or restrictions of pretrial detention . . . the proper inquiry is whether those conditions amount to punishment of the detainee." 441 U.S. at 535. Although there is some disagreement among the Circuits[12] over the scope of detainees' right to be free from punishment—specifically, how the Eighth Amendment deliberate indifference standard from *Estelle*[13] interacts with *Wolfish* in claims by detainees for inadequate medical treatment—the law in this circuit is well-settled.[14] The Third Circuit has drawn a clear distinction between the controlling standards under the Eighth and Fourteenth Amendments, holding that "pretrial detainees are entitled to greater constitutional protection than that provided by the Eighth Amendment." *Hubbard v. Taylor*, 399 F.3d 150, 167 n.23 (3d Cir. 2005) ("[O]ur analysis is consistent with [*Wolfish*'s] distinction between pretrial detainees' protection from 'punishment' under the Fourteenth Amendment, on the one hand, and convicted inmates' protection from punishment that is 'cruel and unusual' under the Eighth Amendment, on the other."). The *Hubbard* Court made clear that the Eighth Amendment's deliberate indifference standard is relevant to claims by pretrial detainees "only because it establishe[s] a floor." *Id.* at 165–67. *Natale* had already recognized that the Fourteenth

---

[11] *See also Montgomery v. Ray*, 145 F. App'x 738, 739 (3d Cir. 2005) (holding that a federal pre-trial detainee's claim for inadequate treatment is properly analyzed under the Fifth Amendment's Due Process to determine if it amounts to punishment).

[12] For a thorough summary of the circuit split, see David C. Gorlin, *Evaluating Punishment in Purgatory: The Need to Separate Pretrial Detainees' Conditions-of-Confinement Claims from Inadequate Eighth Amendment Analysis*, 108 Mich. L. Rev. 417, 421 (2009).

[13] In *Estelle*, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners" constitutes cruel and unusual punishment under the Eighth Amendment. 429 U.S. at 104.

[14] Despite this clarity, Plaintiff has failed at every step to accurately describe the contours of the right, conflating it entirely with prisoners' Eighth Amendment rights.

Amendment guaranteed detainees adequate medical care, and a panel of the Third Circuit, albeit in a non-precedential opinion, had no hesitation in applying *Hubbard's* precepts to claims such as this:

> While the due process rights of a pre-trial detainee are *at least* as great as the Eighth Amendment protections available to a convicted prisoner, the proper standard for examining such claims is the standard set forth in *Bell v. Wolfish*; *i.e.*, whether the conditions of confinement (or here, inadequate medical treatment) amounted to punishment prior to an adjudication of guilt.

*See Ray*, 145 F. App'x at 740 (citations and brackets omitted) (emphasis in original).

Of course, in cases like this, "there will rarely be an expressed intent to punish." *See Mestre v. Wagner*, No. 11-cv-2191, 2012 WL 299652, at *3–4 (E.D. Pa. Feb. 1, 2012) (Savage, J.). So to determine when inadequate medical treatment amounts to punishment, courts in the Third Circuit engage in a two-step test "distilled [from] *Wolfish*'s teachings." *Hubbard*, 399 F.3d at 159. First, the court must ask whether the complained of conditions serve "any legitimate purpose." *Id.* If so, the court must next determine whether the conditions are "rationally related" to that purpose. *Id.* The second step considers whether the conditions cause the detainee to endure such "genuine hardship" that the conditions are "excessive in relation to the purposes assigned to them." *Id.* at 159–60 (citing *Union Cty. Jail Inmates v. DiBuono,* 713 F.2d 984 (3d Cir. 1983)).

B. <u>Section 1983 Theories Supported by Plaintiff's Factual Allegations</u>

Although not artfully pled, Plaintiff's Complaint alleges facts sufficient to support an inference that she was denied her Fourteenth Amendment right to be free from punishment,[15] and that the denial is attributable to the City and Dr. Cohen.

---

[15] Although there is also precedent supporting Plaintiff's allegation that Defendants' conduct amounted to deliberate indifference, my conclusion that she has adequately set out a claim under the more protective Fourteenth Amendment standard obviates the need to analyze her claims under the less protective Eighth Amendment.

1. **Plaintiff's *Monell* Claim Against the City**

The City urges that it should be dismissed from this case because Plaintiff Davis "simply parrots the legal standard for municipal liability under § 1983 without pleading any supporting facts." City's MTD 6. I disagree. A fair reading of Plaintiff's Complaint shows that her factual allegations, if true, describe an unconstitutionally punitive reality at Riverside that could only result from choices by the City's policymakers. *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

First, Plaintiff makes detailed factual allegations supporting her claim that she was deprived of her Fourteenth Amendment right. She alleges that, despite explicit hospital instructions and her own, repeated requests to Riverside staff, she went without urgently needed surgery, endured severe pain, and now has a permanently injured wrist as a result. She attributes this to inadequate intake procedures at Riverside that fail to ensure time-sensitive medical information is relayed by transport police to frontline medical staff, and from frontline staff to an appropriate medical staffer with power to act on it. These alleged practices are not rationally related to the City's otherwise legitimate goal of cost savings, because deprivation of required medical care would be unconstitutionally "excessive in relation" to that goal. *See Hubbard*, 399 F.3d at 159–60; *Kenney v. Montgomery Cty.*, No. 13-cv-2590, 2013 WL 5356862, at *7 (E.D. Pa. Sept. 25, 2013) (DuBois, J.) (denying a motion to dismiss by the county and its prison health contractor because the plaintiff's allegations, although "sparse," adequately set out a claim of "a problematic practice or policy . . . of denying medical care for cost savings reasons.").

Having determined that Plaintiff adequately alleges a deprivation of her Fourteenth Amendment right to be free from punishment, I must next determine if the alleged conduct is

fairly attributable to the City under *Monell*.[16] I conclude that the deprivation Plaintiff describes is plausibly attributable to the City as a policy under several, related *Monell* theories, including as (1) an affirmative policy (embodied in the City's extraordinarily narrow Intake Form), *see* FAC ¶¶ 36, 104; (2) the failure to establish and implement a policy to timely address the serious medical needs of people detained at Riverside, *see* FAC ¶¶ 36, 58, 104; and (3) a failure to train police officers to convey pertinent medical information to the receiving facility, *see* FAC ¶ 110. Upcoming discovery will test Plaintiff's allegations against evidence and reveal whether the reality at Riverside is as Plaintiff describes. *See Phillips*, 515 F.3d at 234.

First, Plaintiff can show that the City is "actually responsible" for violating her Fourteenth Amendment right if she identifies an affirmative municipal policy and alleges facts showing that the "act complained of is simply an implementation of that policy." *See Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 417 (1997); *see also City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (explaining that, for § 1983 purposes, a municipal "policy" must reflect a "deliberate" or "conscious" choice by a municipality). Plaintiff has adequately alleged that the City's Intake Form amounts to an affirmative policy, pursuant to which Riverside staff conducted an inadequate initial health screening of Plaintiff when she first arrived. *See, e.g.*, *Rodriguez v. City of Philadelphia*, No. 14-cv-7362, 2015 WL 4461785, at *4 (E.D. Pa. July 21, 2015) (denying a motion to dismiss where plaintiff detainee alleged that his broken wrist healed incorrectly in a

---

[16] I do not read the City's Motion to challenge causation. To the extent that it does, I conclude that Plaintiff's Complaint adequately alleges that the City's delay in allowing her to access required treatment plausibly resulted in the pain, improper healing, and continuing functional limitations of Plaintiff's wrist. *See, e.g.*, *Natale*, 318 F.3d at 585 (holding at the summary judgment stage that "[t]he failure to establish . . . a policy [to address the immediate medication needs of inmates with serious medical conditions] is a particularly glaring omission in a program of medical care. [A reasonable jury] could . . . infer that the failure to establish a more responsive policy caused the specific constitutional violation of which the [Plaintiff detainee] complain[s], *i.e.*, the failure to administer insulin . . . in a timely fashion.").

splint, despite hospital instructions and his repeated requests to Corizon for treatment and pain medication, because the Philadelphia Prison System had a policy against allowing hard casts).

The City is correct that, under *McTernan v. City of York*, Plaintiff must allege conduct by a municipal policymaker to support her claim for municipal liability. *See* 564 F.3d 636, 659 (3d Cir. 2009). In *McTernan*, the Third Circuit affirmed the lower court's dismissal of an abortion-protestor plaintiff's claim where the plaintiff "simply paraphrased § 1983," stating that "[a]ll of the acts of the Defendants . . . were conducted under color of law." *Id*. Unlike the legal conclusions rejected by the *McTernan* Court, Plaintiff's factual allegations here specify the content of Riverside's printed Intake Form, its routine use by Riverside medical staff in the intake process, and its effect on Plaintiff's access to treatment while at Riverside. The City's suggestion that a printed intake form is not the result of a deliberate choice by a municipal policymaker is not supportable or persuasive. *See* City's MTD 7–8.[17]

Second, Plaintiff has alleged facts that support another, related theory of liability: that the City failed to develop and implement policies and procedures necessary to ensure adequate intake assessments and timely medical assistance to detainees. *See, e.g.*, *Natale*, 318 F.3d at 584. In *Natale*, a diabetic pre-trial detainee brought a § 1983 claim against the county and Prison Health Services for failing to administer insulin during his first 72 hours of detention. 318 F.3d at 584. *Natale* pled *Monell* liability based on the county's "failure to establish a policy to address the

---

[17] Moreover, several courts in this circuit, recognizing *Monell* plaintiffs' lack of access to municipal policy information at this early stage, have held that plaintiffs are not required "to plead with special particularity the exact policies and practices that were in place, prior to taking any discovery into the alleged policies, [or] explain exactly how these precisely alleged policies caused or contributed to [their] injuries." *Kenney*, 2013 WL 5356862, at *7 (listing cases); *Hasty v. Cty. of Montgomery*, No. 12-cv-4335, 2014 WL 830282, at *4 (E.D. Pa. Mar. 4, 2014) (Surrick, J.) (holding the same where a pretrial detainee alleged that his requests for urgent medical care were "ignored, delayed, or denied"—one of four cases in this district that have cited *Kenney* for the foregoing pleading proposition).

medication needs of inmates during the first 72 hours of incarceration." The Court denied summary judgment, reasoning that:

> [T]here is no evidence that [Prison Health Services] had an affirmative policy or custom that prevented its employees from inquiring into the frequency with which Natale required insulin. There is, however, evidence that PHS turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights. . . there was no policy ensuring that an inmate [in] need of medication for a serious medical condition would be given that medication during the first 72 hours of incarceration.

*Id.*

Here, as in *Natale*, there is no allegation that the City or its health provider had a rule prohibiting its intake staff (or its physicians) from asking about arriving detainees' serious medical needs or recent hospitalizations, or against responding to detainees' urgent requests for care. Rather, Plaintiff alleges that the City chose not to ask these basic medical questions. In a major city with large numbers of people entering detention centers every day, this choice gives rise to an inference that the City could have "turned a blind eye to an obviously inadequate practice." *See id.*; *Hasty*, 2014 WL 830282, at *4 (holding that a pre-trial detainee's factual allegations "clearly support a plausible claim for relief under the theory that [the county] failed to adopt and implement policies and procedures necessary to ensure timely medical assistance"); *Kenney*, 2013 WL 5356862, at *7 (denying motion to dismiss where plaintiff alleged that the county and its prison health provider "failed to develop and implement policies, practices, and procedures . . . that would ensure inmates received appropriate care and necessary referrals"); *see also Inmates of Occoquan v. Barry*, 717 F. Supp. 854, 867 (D.D.C. 1989) ("Defendants have failed to develop a reliable screening system for inmates entering [the detention center] as shown by the lack of testing for [infectious diseases]. There is no follow-up system for treating chronic diseases and inmates wait months for appointments to specialty clinics."); *Wichterman v. City of Philadelphia*, No. 16-cv-5796, 2017 WL 1374528, at *4 (E.D. Pa. Apr. 17, 2017) (where plaintiff detainee died

15

of an overdose just hours after admitting at intake to heroin use, denying motion to dismiss because"[t]he City's alleged failure to implement appropriate policies and practices . . . constitute[d] a practice or custom . . . ascribable to municipal decision makers").

Third, Plaintiff has adequately pled a failure-to-train theory against the City, alleging that it failed to train its police to relay detainees' medical information to detention center staff. The Supreme Court has held that a city has an unconstitutional policy when it fails to train its employees despite an obvious need for training, and when that failure is likely to result in an employee making a wrong decision. *Harris*, 489 U.S. at 389. The *Harris* Court acknowledged that it "may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees," but explained that "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. For example, the Court said that because city policymakers "know to a moral certainty" that their police officers will need to arrest fleeing felons, the need to train officers on the use of deadly force is "so obvious" that the failure to do so could constitute deliberate indifference to constitutional rights. *Id.* at 390 n.10. Similarly, in a major city like Philadelphia, there can be no doubt that police officers will, as part of their duties, regularly transport detainees (and prisoners) with serious medical needs to and among the City's detention facilities. Those detainees may be coming from a hospital to a detention facility, or moving from one facility to another—this case involves both scenarios. It is plausible then, that the need to train police to relay urgent medical information could be "so obvious" that a failure to do so would amount to deliberate indifference.

The City insists that Plaintiff's failure-to-train claim must fail because she "alleges no facts regarding prior instances of police misconduct caused by allegedly inadequate training." City's

16

MTD 8. Although it is true that "a pattern of similar constitutional violations by untrained employees is ordinarily necessary" to make out a failure-to-train claim under *Monell*, the need for training in a given situation may be "so obvious" that failure to do so amounts to an unconstitutional policy "even without a pattern of constitutional violations." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) (citing *Harris*, 489 U.S. at 389 n.10). As long as Plaintiff relies on a "single incident" theory, the City's failure-to-train liability will "depend[] on the likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *See id.* at 223–24. For now, Plaintiff's failure-to-train claim survives this Motion to Dismiss. Continued survival of that claim will turn on Plaintiff's ability to show not only that police frequently fail to relay important medical information to the City's detention facilities, but also that officers without training on the issue are likely to violate detainees' rights by not relaying that information.

### 2. Plaintiff's Section 1983 Claim Against Dr. Cohen

Having found that Plaintiff adequately sets out a *Monell* claim against the City, I next examine whether she has adequately alleged that Dr. Cohen deprived her of the same right—her Fourteenth Amendment right to be free from punishment as a pre-trial detainee at Riverside. Returning to the two-step test from *Hubbard*, I must determine whether Dr. Cohen's conduct, as alleged by Plaintiff, served a "legitimate purpose" and, if so, whether his conduct was "rationally related" to that purpose, or whether the conduct was "excessive" in relation to it. *See* 399 F.3d at 159. As noted above, Plaintiff alleges that Dr. Cohen limited her access to medical care for the "non-medical reason" of cost avoidance. Although cost saving is a legitimate purpose, I conclude that Dr. Cohen's alleged actions toward Plaintiff would not be rationally related to that purpose because they caused Plaintiff to endure "genuine hardship." *See id.*

As discussed above, Plaintiff alleges that Dr. Cohen failed to adequately treat her pain and swelling during her six days at Riverside, and—despite her repeated requests to see a specialist for surgery, as the hospital had ordered—delayed Plaintiff's access to urgently needed surgery by failing to order an orthopedic consult or x-ray until Plaintiff's fifth and sixth day in custody, respectively. Plaintiff further alleges that, upon her transfer to SCI Muncy, Dr. Cohen further delayed her care when he omitted crucial information from her Transfer Summary that would have indicated to the receiving facility her urgent need for treatment. Plaintiff claims that Dr. Cohen not only failed to include important information in the Transfer Summary, but also answered questions incorrectly that would have signaled Plaintiff's need for urgent care, *i.e.* about recent hospitalizations and pending consults. These allegations, if true, would certainly be excessive in relation to a legitimate goal of saving money. *See Kenney*, 2013 WL 5356862, at *5 (holding that plaintiff had adequately pled a deliberate indifference claim—a more demanding standard than Plaintiff Davis faces here—where plaintiff alleged that the prison doctor made decisions about plaintiff's care because the doctor was "financially motivated not to order diagnostic testing and/or refer patients for outside treatment"); *see also Hasty*, 2014 WL 830282, at *8 (denying defendant doctor's motion to dismiss where plaintiff detainee alleged that the doctor "ignored and denied Plaintiff's repeated requests for medical assistance" and failed to establish a medical referral system "capable of providing immediate care to an inmate with an emergency medical condition").

I am not persuaded by Dr. Cohen's response: that he "exercised his medical judgment and treated Plaintiff by ordering an x-ray and referring her for an orthopedic evaluation." Cohen's MTD 4. This fails to address Plaintiff's claim of delay. At their core, her allegations pertain to timeliness—that when Dr. Cohen finally responded to her request for surgery by ordering a consult, it was too late. Regarding the allegedly inaccurate and incomplete Transfer Summary, Dr.

Cohen simply counters that he "completed the required summary paperwork." *Id.* To the extent that this raises a factual dispute, I must take Plaintiff's version of the facts as true.

The remainder of Dr. Cohen's opposition focuses on the deliberate indifference standard, which, under *Hubbard*, is merely the *floor* of my inquiry here. *See* Cohen's MTD 3. Dr. Cohen cites three scenarios where courts have found deliberate indifference: where a prison official "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended treatment." *Id.* at 3 (citing *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)). Having already found that Plaintiff's allegations against Dr. Cohen make out a plausible claim under the Fourteenth Amendment, I need not analyze them under the Eighth Amendment's deliberate indifference standard. I note, however, that several cases suggest that her allegations would satisfy the deliberate indifference standard, as well. *See, e.g.*, *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) (prison doctor's defiance of "explicit medical instructions," including from a hospital, is deliberate indifference when it results in "serious and obvious injuries"); *Brown v. Farrell*, No. 16-cv-3097, 2017 WL 1243155, at *3 (E.D. Pa. Mar. 30, 2017) (denying doctor's motion to dismiss where plaintiff prisoner alleged that his complaints of pain were "blatantly ignored" and listing cases likewise finding that ignoring pain complaints amounts to deliberate indifference); *Scantling v. Vaughn*, No. 03-cv-0067, 2004 WL 306126, at *7-8 (E.D. Pa. Feb. 12, 2004) (denying motion to dismiss prisoner's deliberate indifference claims against prison doctors who were alleged to have known about his pain and denied the treatment he requested).

C. <u>Plaintiff's Medical Malpractice Claim Against Dr. Cohen</u>

Although medical malpractice alone does not necessarily give rise to a constitutional

claim, *Estelle*, 429 U.S. at 106, my finding above that Plaintiff has adequately pled a constitutional claim against Dr. Cohen for inadequate treatment motivated by cost-savings surely extends to her claim medical malpractice against him.

To plead a medical malpractice claim in Pennsylvania, plaintiffs must allege all of the traditional elements of negligence: that the doctor owed a duty to the patient, that he breached that duty, that the breach was the proximate cause of plaintiff's harm, and that damages resulted from the harm. *Quinby v. Plumsteadville Family Practice*, 589 Pa. 183, 199, 907 A.2d 1061, 1070 (2006). Plaintiff's allegations address all of these elements. On duty, Plaintiff alleges that Dr. Cohen was responsible for her medical care, including decisions about her access to care, while she was detained at Riverside. FAC ¶¶ 12, 18, 117. On breach, she alleges that he ignored her complaints of severe pain and swelling, denied or delayed her access to an orthopedic specialist, and failed to adequately document her treatment history and needs in Riverside records. FAC ¶ 120. Regarding causation and damages, she alleges that his inadequate care caused her unnecessary pain, an improperly healed wrist, and continuing pain and limited mobility. *See* FAC ¶ 120(i). Based on these allegations, I easily conclude that Plaintiff has stated a claim for medical malpractice against Dr. Cohen and is entitled to discovery.

                                               /s/ Gerald Austin McHugh
                                               United States District Judge